THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
DAVID L. KIRMAN
Assistant United States Attorney
California Bar Number 235175
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-4442
    Facsimile:  (213) 894-0141
    E-mail: David.Kirman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 08-01475-R |
| | ) | |
| Plaintiff, | ) | |
| | ) | [~~PROPOSED~~] FINDINGS OF FACT |
| v. | ) | AND CONCLUSIONS OF LAW RE: |
| | ) | DEFENDANT LY'S MOTION TO |
| BAO CHAU LY, and | ) | SUPPRESS |
| DABONA TANG, | ) | |
|   aka "Ryan," | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

1

## I.    INTRODUCTION

On December 19, 2008, the United States filed an indictment against defendant BAO CHAU LY ("defendant") alleging that he (1) conspired with co-defendant Dabona Tang to possess with intent to distribute 3,4-Methylenedioxy- methamphetamine ("MDMA") in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); (2) distributed MDMA in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and (3) possessed MDMA with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  The indictment stems from an undercover surveillance operation where law enforcement observed defendant deliver a tin box containing 2,000 MDMA pills to co-defendant Dabona Tang, defendant's admission that he purchased and delivered 2,000 MDMA pills earlier that day, and $3,500 seized during a search of defendant's residence.

On February 23, 2009, defendant filed a motion to suppress his admission that he bought and sold 2,000 MDMA pills and the $3,500 found in his residence.  Defendant claimed this evidence should be suppressed because: (1) the officers lacked exigent circumstances to conduct a warrantless entry of defendant's home; (2) the $3,500 was found before the search warrant was approved, and defendant's consent to the search was coerced; (3) defendant did not waive his <u>Miranda</u> rights; and (4) assuming that the officers' entry lacked exigent circumstances, defendant's confession and the discovery of the $3,500 were not sufficiently attenuated from the illegal entry to render these fruits of the poisonous tree admissible.  Defendant filed no declarations in

2

support of his motion.

On February 23, 2009, the government filed its opposition to defendant's motion to suppress.  The government argued that (1) exigent circumstances existed; (2) defendant's consent was not coerced; (3) defendant waived <u>Miranda</u>; and (4) even if there were issues with the entry, the confession and $3,500 were sufficiently attenuated from the entry.  In support of its opposition, the government filed the declarations of Montebello Police Officers Keller, Camuy, Jackson, and Hoffman.

On February 23, 2009, this Court held an evidentiary hearing on defendant's motion.  The declarations of Keller, Camuy, Jackson, and Hoffman were admitted into evidence as the witnesses' direct testimony, and defendant cross-examined each witness.  At the conclusion of the government's case, defendant and his girlfriend, Linda Hang, testified as witness in support of the motion to suppress.  The government also called DEA Special Agent Paul McQuay as a rebuttal witness.

The Court has thoroughly reviewed all the papers filed by the parties, heard and evaluated the testimony of the witnesses at the February 23, 2009 hearing and in their declarations, weighed the evidence, and considered the arguments of counsel. For the following reasons, the Suppression Motion is hereby DENIED.

**II.   RELEVANT FINDINGS OF FACT**

The Court makes the following findings of fact after fully considering and weighing the (1) sworn declarations of Montebello Police Officers Steve Keller, Ray Camuy, Steven Jackson, and Sean

Hoffman; (2) the direct testimony of Drug Enforcement Agency
Special Agent Paul McQuay; (3) the direct testimony of defendant
and defendant's girlfriend, Linda Hang; and (4) cross and
redirect examination of each witness.

1.   This case arose out of a Drug Enforcement Agency ("DEA")
and Montebello Police Department ("MPD") investigation of a MDMA
distribution conspiracy in Los Angeles County.   During that
investigation, the DEA and MPD developed a confidential informant
("CI") who agreed to arrange a purchase of MDMA from one of his
sources.   That source was Dabona Tang.

2.   On April 16, 2008, the CI made arrangements to purchase
2,000 MDMA pills from Tang.   Before the 2,000-pill transaction,
the CI and Tang agreed to an exchange of samples.   That day, Tang
and the CI met at a 7-11 near Tang's residence and provided
samples of the MDMA.   Detective Hoffman observed the meeting and
transaction at the 7-11.   The CI gave Detective Hoffman the
samples.

3.   On April 22, 2008, the CI and Tang agreed to execute the
2,000-pill transaction.   In anticipation of this transaction,
officers and agents began an undercover surveillance operation of
Tang and his residence.   Officers were also in frequent
communication with the CI who told them the status of the
transaction.   Tang told the CI that he didn't have the requested
MDMA but he could obtain it from his source before 7:45 p.m.

4.   From the time of Tang's admission to the CI that he
didn't have the MDMA but would get it by 7:45 p.m., until 7:30
p.m., officers observed that no one entered Tang's residence.

4

Then, at 7:30 p.m., 15 minutes before Tang's deadline to receive the MDMA, defendant drove up to Tang's residence, carried a tin cookie box large enough to carry 2,000 Ecstasy pills inside Tang's residence, and left empty-handed.  Based on this information, the officers reasonably believed that defendant delivered the MDMA to Tang.

    5.  After observing defendant deliver the drugs, the officers split up the surveillance team in two parts.  One team followed defendant back to his house.  The other remained at Tang's house.

    6.  At around 9:30 p.m., Tang left his residence to deliver the MDMA to the CI.  Shortly after Tang left his house, officers from the Pasadena Police Department conducted a traffic stop of Tang and obtained consent to search his vehicle.  From Tang's vehicle, officers recovered a small tin cookie box filled with 2,000 MDMA pills.  This is the same box agents observed defendant deliver to Tang.

    7.  The officers outside of defendant's house were in contact with the officers who conducted the traffic stop on Tang.  They knew when Tang was pulled over, and that the Ecstasy had been found in Tang's vehicle.  At around 9:30 p.m., the same time of the traffic stop of Tang, it is undisputed that officers saw defendant run out of his residence to his car.  He appeared to place or retrieve something from the car and then ran back into the house.

    8.  Based on their experience in other drug cases, the officers believed that defendant ran out of the house because

1   Tang had contacted him and told him of the traffic stop.  Based
2   on extensive training and experience, officers believed that
3   defendant would seek to destroy drug evidence in his vehicle or
4   home.  Therefore, the officers decided to secure defendant's
5   residence to prevent him from destroying evidence.

6        9.   Shortly after officers observed defendant run out of his
7   car and run back in the house, at around 10:00 p.m., officers
8   knocked on defendant's door.  They waited 15 - 30 seconds but
9   received no answer.  Because officers knew defendant was inside
10  and had not received an answer, they forced entry into the house
11  by breaking down the door.  To wait longer would have put the
12  officers' safety in danger because drug dealers are known to
13  posses weapons and they could have retrieved those weapons or
14  barricaded themselves inside.  Upon entry, officers secured the
15  premises and conducted a protective sweep, but did not search the
16  house.

17       10.  The delay between observing defendant run into the
18  house and preparing to enter the house did not reduce the
19  exigency.  Testimony established that: (1) dealers who are
20  sources of large amounts of drugs, as officers reasonably
21  believed defendant was, often have large stashes of drugs in
22  their house; dealers who deal in MDMA frequently also deal in
23  marijuana; marijuana is bulky and can take longer to destroy than
24  the time it took the officers to enter defendant's residence;
25  and, similarly, MDMA, especially MDMA capsules which are full of
26  air, are also difficult to dispose by flushing them down the
27  toilet because they often float.

28

11.  All the residents were sitting at the table within a few minutes of entry.  Initially, Mr. and Ms. Hang appeared upset and confused due to the entry.  Through Linda Hang, officers explained to Mr. and Ms. Hang that we were not there for them or their daughter.  Officers explained that we were there because defendant was a suspected narcotics trafficker.  At that point, Mr. and Ms. Hang appeared to relax, but Mr. Hang appeared to glare angrily at defendant.

12.  Officer Camuy asked Linda Hang for permission to search.  She told officers that they could search and that would not find anything.  Officer Camuy also asked defendant for permission to search.  He consented and indicated that he had already given consent to search and told them they wouldn't find anything.  Indeed, the residents of the house, including Linda and defendant, were asking the officers to hurry up and search because they wanted the officers to leave.

13.  Linda Hang and defendant later confirmed their consent in a consent-to-search form.  During his recorded interview, defendant also confirmed that he had given consent to search the residence before the interview.

14.  Around 11:40 p.m., Officer Camuy asked defendant if he agreed to be interviewed.  Defendant agreed.  Defendant's interview occurred in an upstairs loft area inside the house.  The loft was in an open area.  The interview was recorded.

15.  Before beginning the interview, Officer Camuy had defendant sit on a couch.  Officer Camuy removed defendant's handcuffs.  Officer Camuy placed a recorder on a coffee table in

7

front of the couch.  Because there was no chair, Officer Camuy
sat on the floor during the interview.

16.   Officer Camuy read defendant his <u>Miranda</u> rights.  One
of defendant's answers in response to <u>Miranda</u> was equivocal for a
brief period, Officer Camuy clarified that equivocation, and
defendant expressly waived those rights during the recorded
interview.  Defendant simultaneously signed a <u>Miranda</u> waiver.

17. Officer Camuy asked defendant to explain what he did
that day.  Defendant explained that in the morning, he took his
mom to the hospital.  In the evening, he "went to this guy named
Solo to pick up two boat[s][1]" of MDMA.  He purchased the two
boats for $4,000.  He then delivered the two boats of MDMA to
this "other guy" in Alhambra.  The other guy did not pay him at
that time but the agreed-upon price was $5,600.

18.   The tone of the interview was relaxed.  Defendant
appeared mostly embarrassed that he was involved in drug dealing.
There were no threats.

19.   Officer Camuy was with defendant almost the entire
time.  At no time did Camuy or other officers threaten defendant,
suggest that they would ruin Linda Hang's career if defendant
failed to cooperate, or suggest that Linda Hang would lose her
children if defendant did not cooperate.

20.   After the interview, the officers found the $3,500.

21.   After finding the $3,500, a state search warrant was
issued and served on defendant for his residence.

---

[1]A "boat" is street vernacular for 1,000 MDMA pills.

8

**III. RULINGS**

**A.    The Entry To Defendant's Residence Was Proper**

A warrantless search of a dwelling does not violate the Fourth Amendment if the search is "supported by probable cause and the existence of exigent circumstances." Bailey v. Newland, 263 F.3d 1022, 1032 (9th Cir. 2001).  Probable cause is established when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996).  Defendant does not dispute that probable cause existed.

"[E]xigent circumstances are present when a reasonable person [would] believe that entry . . . was necessary to prevent . . . the destruction of relevant evidence." Bailey, 263 F.3d at 1033 (internal quotation marks omitted) (alteration in original). "Because narcotics can be destroyed easily, criminal investigations involving narcotics often result in warrantless searches or seizures based on exigent circumstances." Annual Review of Criminal Procedure, 37 Geo. L.J. Ann. Rev. Crim. Proc. 74 (2008); United States v. Bynum, 362 F.3d 574, 581 (9th Cir. 2004) ("the disposable nature of drugs contributes to a finding of exigent circumstances" . . . drugs are the "quintessential disposable contraband"); see also United States v. Alaimalo, 313 F3d 1188, 1193 - 94 (9th Cir. 2002).

Here, exigent circumstances existed because the officers believed that defendant was going to destroy the drugs they suspected were in his residence.  At the same time the Pasadena

Police stopped Tang, officers observed defendant run out of his
residence, go to his car and either place or retrieve something,
and run back into the house.  They believed, based on defendant's
movements, his earlier drug delivery, Tang's communication via
cellular telephone, and their experience, that Tang had called
defendant and told him that law enforcement suspected that they
were engaged in narcotics trafficking.  There was no other
apparent explanation for defendant's run to his vehicle.

The exigency is analogous to similar cases where the Ninth
Circuit found exigent circumstances.  In many of those cases,
Ninth Circuit held that an exigency exists where a suspect was or
*could be* apprised of police action and such an apprisal would
result in the destruction of drugs.  *See* United States v. Lai,
944 F.2d 1434, 1443 (9th Cir. 1991); United States v.
Wulferdinger, 782 F.2d 1473, 1476 (9th Cir. 1986); United States
v. Hicks, 752 F.2d 379 (9th Cir. 1985); United States v. Kunkler,
679 F.2d 187 (9th Cir. 1982); see also  United States v.
Straughter, 950 F.2d 1223, 1230 (6th Cir. 1991); United States v.
Rubin, 474 F.2d 262, 268 - 269 (3d Cir. 1973).

**B.   Defendant's Consent Was Not Coerced**

Nor did the warrantless entry based on these valid exigent
circumstances vitiate the defendant's knowing and voluntary
consent as demonstrated by the declarations.  The Ninth Circuit,
on almost identical facts, upheld a defendant's consent despite
the officers effecting a forcible entry, handcuffing the
defendant, and drawing their weapons.  United States v. Lindsay,
877 F.2d 777 (9th Cir. 1989).

10

The Court also read the declarations and heard the testimony of four officers present during the search. Each stated that no threats were made to defendant or his girlfriend, Linda Hang. Their declarations were consistent. The Court also evaluated their credibility and found them credible. Based on the Court's observations of defendant and Linda Hang's in-court testimony, their claims that the officers threatened them were not credible.

Finally, defendant and Ms. Hang admitted in court that they consented to the search because they had nothing to hide and wanted the officers to leave the house more quickly.

### C. Defendant Waived His <u>Miranda</u> Rights And Voluntarily Confessed

Defendant's interview reveals that Detective Camuy advised defendant of each of his <u>Miranda</u> rights and asked if defendant understood each one; defendant answered affirmatively on each. Then, Detective Camuy asked defendant if he waived those rights. In a soft voice, defendant said "No. I mean I . . . ." After hearing this equivocal answer, Detective Camuy asked "Is that a yes?". Defendant responded "Yes. Yes, sir," and proceeded to sign the written <u>Miranda</u> waiver and respond to the Detective's questions. Defendant's equivocation justified the subsequent clarification question that yielded the unambiguous and unequivocal <u>Miranda</u> waiver.

When faced with an equivocal <u>Miranda</u> waiver such as this, police officers are permitted only to ask questions to clarify the equivocal waiver. "[W]here a suspect makes an equivocal assertion of the right to counsel, police must cease all

11

1 questioning, except that they may attempt to clarify the
2 suspect's desire for counsel." <u>United States v. Nordling</u>, 804
3 1466, 1470 (9th Cir. 1986) (internal citation omitted).

4 Defendant's assertions that officers threatened him, which
5 were repeated by defendant's girlfriend, were not credible.  For
6 example, defendant claimed that the person who made the threats
7 was wearing a "DEA" vest, yet a DEA Agent Paul McQuay testified
8 that no DEA agents were present at that location.  The Court
9 credits the testimony of the agents, all of whom testified that
10 they did not hear any threats to defendant or his girlfriend.
11 The Court, having evaluated the credibility of the witnesses
12 based on their in-Court testimony, and considering all the
13 relevant evidence, finds the defendant's consent to be knowing
14 and voluntary.

15 **D.   Even If The Entry Was Illegal, Defendant's Confession**
16 **and the Search Are Attenuated From the Search of the**
17 **House**

18 Even if it were true that the police officers lacked exigent
19 circumstances to search defendant's house, defendant's confession
20 and the $3,500 cash found in defendant's room should not be
21 suppressed because they were too attenuated from the allegedly
22 illegal search.

23 Fruits of an illegal search, including admissions and
24 tangible evidence, are generally suppressed unless the government
25 can show that the making of the admissions and discovering of the
26 tangible evidence are attenuated from the illegal search.  <u>Brown</u>
27 <u>v. Illinois</u>, 422 U.S. 590, 602-03 (1975).  As stated in <u>Brown</u>:
28

12

1    The question whether a confession is the product of a
2    free will under Wong Sun must be answered on the facts
3    of each case.  No single fact is dispositive.  The
4    workings of the human mind are too complex, and the
5    possibilities of misconduct too diverse, to permit
6    protection of the Fourth Amendment to turn on such a
7    talismanic test.  The Miranda warnings are an important
8    factor, to be sure, in determining whether the
9    confession is obtained by exploitation of an illegal
10   arrest.  But they are not the only factor to be
11   considered.  The temporal proximity of the arrest and
12   the confession, the presence of intervening
13   circumstances, see Johnson v. Louisiana, 406 U.S. 356,
14   365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972), and,
15   particularly, the purpose and flagrancy of the official
16   misconduct are all relevant.  See Wong Sun v. United
17   States, 371 U.S. [471] at 491, 83 S.Ct. [407] at 419.
18   Brown, 422 U.S. at 603-04.

19   Defendant's post-Miranda-warning confession occurred nearly
20   two hours after the officers entered the residence, and with
21   probable cause to arrest defendant, which defendant does not
22   dispute.  The confession was not immediately after the entry, but
23   neither was it days after, so this factor does not clearly weigh
24   in either party's favor.  The cash was found even later, after
25   defendant's confession was taken.

26   In the present case, defendant received Miranda warnings,
27   which are an "important factor" under Brown in determining
28

13

1   whether the confession was attenuated.   The <u>Miranda</u> warnings and
2   the oral and written consent to search are not the only
3   intervening circumstance here: defendant's and defendant's
4   girlfriend both requested that the agents search the premises, a
5   factor not present in any case cited by defendant.   In addition,
6   defendant and his girlfriend urged the officers to start their
7   search as soon as possible.

8        The fact of probable cause to arrest, which did not exist in
9   <u>Brown</u>, is important and weighs in favor of finding attenuation.
10  <u>United States v. Manuel</u>, 706 F.2d 908, 911-12 (9th Cir. 1983)
11  (distinguishing <u>Brown</u> and other attenuation cases that suppressed
12  confessions occurring after arrests that lacked probable cause).
13  However, the fact that the confession occurred in defendant's
14  home weighs against an attenuation finding.   <u>See</u>, <u>e.g.</u>, <u>United</u>
15  <u>States v. Crawford</u>, 372 F.3d 1048, 1056-57 (9th Cir. 2004)
16  (discussing the importance of probable cause, but also of the
17  location of the confession).

18       Finally, the purpose of the alleged official misconduct was
19  to preserve drug evidence that the officers thought was being
20  destroyed, hardly an improper purpose.   The flagrancy of the
21  alleged official misconduct also weighs in the government's
22  favor; although the agents knocked and eventually used a
23  battering ram on the door, their conduct once inside put the
24  residents at ease and was not designed to intimidate or coerce
25  the occupants.   Further, Detective Camuy did not use any seized
26  evidence or the fact of the entry to obtain defendant's
27  voluntary, <u>Mirandized</u> statements.   In addition, the officers did

28

                                    14

not search the residence until after defendant volunteered his consent, substantially undercutting his argument that the Miranda waiver and the oral consent should be ignored and his confession and the $3,500 in cash should be suppressed.  Therefore, the government has met its burden to show that the statements and $3,500 found were sufficiently attenuated from any arguably improper entry.

**IV.   CONCLUSION**

The Court finds that: (1) exigent circumstances existed; (2) defendant's consent was not coerced; (3) defendant waived Miranda; and (4) even if there were issues with the entry, the confession and $3,500 were sufficiently attenuated from the entry.  Accordingly, defendant's Motion to Suppress is DENIED in its entirety.  It is so FOUND and ORDERED.  The findings of fact and conclusions of law stated in this ORDER shall supplement the findings of fact and conclusions of law previously stated by the Court at the evidentiary hearing on the Suppression Motion.


DATED: March 5, 2009

_____
                 HONORABLE MANUEL L. REAL
                 UNITED STATES DISTRICT JUDGE


Submitted by:

_____/s/_____
DAVID L. KIRMAN
Assistant United States Attorney